IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALLSTATE INSURANCE COMPANY
*Plaintiff*,

v.

Civil Action No. ELH-17-3400

STANLEY ROCHKIND, *et al.*
*Defendants*.

## MEMORANDUM OPINION

"[A]n insurance company cannot be held liable for periods of risk it never contracted to cover." *Pennsylvania National Mutual Casualty Ins. Co. v. Roberts*, 668 F.3d 106, 109 (4th Cir. 2012). The insurance dispute at here issue concerns this "straightforward" principle. *Id.* But, the dispute is anything but straightforward.

Plaintiff Allstate Insurance Company ("Allstate") has filed a declaratory judgment action against defendants Stanley Rochkind, individually and as trustee of the assets of both Dear Management and Construction Company ("Dear Management") and Uptown Realty Co. Limited Partnership ("Uptown").[1] *See* ECF 1 ("Complaint"). Allstate has also sued Malik Sherald, who was the plaintiff in a lead paint action that he filed against Rochkind in February 2017 in the Circuit Court for Baltimore City (the "Tort Case"). In the Tort Case, Sherald alleged injury from lead paint exposure in connection with a property owned, maintained, and/or managed by Rochkind. *See* ECF 1-2 (the Tort Case Complaint).[2]

_____

[1] Dear Management and Uptown are forfeited Maryland corporations. ECF 1, ¶¶ 3-4.

[2] Jurisdiction in this case is founded on diversity, pursuant to 28 U.S.C. § 1332. ECF 1, ¶ 6.

Beginning in June 1988, Allstate issued a Personal Umbrella Policy (ECF 1-3, the "Policy") to Rochkind, who owns and manages residential properties in Baltimore. ECF 1, ¶ 11. The Policy, which provided excess personal liability coverage to Rochkind, was continually renewed over the next decade. *Id.* But, on June 13, 1999, Allstate modified the terms to exclude coverage for claims arising from lead paint exposure. *Id.* Then, on or about June 13, 2000, Allstate cancelled the Policy. ECF 1-3 at 8; *see also* ECF 22-1 at 2; ECF 38 at 9. Allstate now seeks a declaration that it has no duty to defend or indemnify Rochkind for injuries allegedly sustained by Sherald arising from lead paint exposure on or after June 13, 1999, *i.e.*, the effective date of the lead paint exclusion. *Id.* ¶ 12.

According to Allstate, Sherald's total lead exposure was 3858 days; it insured Rochkind for 1195 days; and therefore Allstate's total liability is 30.1% of any damages awarded against Rochkind (1195/3858). ECF 25 at 1.[3] According to Allstate, Rochkind is liable for the remaining 69.9% of any judgment in favor of Sherald. ECF 1 at 6.

Three motions are now pending. First, Allstate has moved for summary judgment (ECF 22), supported by a memorandum of law (ECF 22-1) (collectively the "Allstate Motion") and two exhibits. ECF 22-2; ECF 22-3. Defendants filed a consolidated opposition and a cross motion for summary judgment or, in the alternative, to certify issues to the Maryland Court of Appeals. ECF 25 ("Cross Motion"). They also submitted two exhibits. ECF 25-1; ECF 25-2. Plaintiff filed a consolidated reply and opposition. ECF 29. Defendants replied (ECF 38) and submitted the Affidavit of Paul Rogers, M.D., an expert in neurodevelopmental pediatrics. ECF 28-1. The Affidavit pertains to Sherald's period of exposure to lead.

_____

[3] My calculation suggests that 1,195 divided by 3,858 equals 30.97%, but the discrepancy is not material.

Allstate has moved to strike the Affidavit of Dr. Rogers.  ECF 39.  Defendants oppose the motion (ECF 40), and Allstate submitted a reply.  ECF 43.

The Motions are fully briefed and no hearing is necessary to resolve them.  *See* Local Rule 105.6.  For the foregoing reasons, I shall deny the motions.

## I.  Factual Summary

On February 27, 2017, in the Circuit Court for Baltimore City, Sherald sued Rochkind, individually and as trustee of the assets of Dear Management and Uptown.  *Sherald v. Rochkind*, No. 24-C-17-000943; *see also* ECF 1-2.  Sherald, who is now 23-years of age, alleged claims of negligence. He asserted that his mother, grandparents, and great grandmother lived at or visited 2722 Riggs Avenue in Baltimore City ("Property") from 1964 to the "present."  *Id.* at 5, ¶ 5.  According to Sherald, the Property was operated and controlled by Rochkind, Dear Management, and Uptown.  *Id.* at 4-5, 13-15.  Moreover, he asserted that he was exposed to lead paint at the Property from the time of his birth on March 6, 1996, to the "present," while either residing or visiting at the Property.  *Id.* at 5.  However, Sherald also appears to have alleged that *damaging* exposure occurred only until June 1999.  *Id.* at 13-15; *see* ECF 25 at 33, 43-45.

Allstate was not a party to the Tort Case.  The parties do not state whether Allstate provided a defense to Rochkind in the suit.  *See* ECF 1-2.

During the pendency of the Tort Case, the parties engaged in discovery.  During discovery, Sherald stated in an answer to an interrogatory: "Since birth, [Sherald] has always spent most of his time at [Rochkind's] rental property located at 2722 Riggs Avenue, where he currently resides."  ECF 22-2 at 5.  However, Sherald also stated that his parents "held [other] rental residences where Plaintiff would usually, but not always, sleep and call home."  *Id.*  He identified

three other residences where he had lived: One from birth to age 2; a second from ages 2 to 7; and a third from 2003 to the present. ECF 22-2 at 5.

Of relevance here, Sherald described the condition of the Property, *id.* at 7:

> The premises were not maintained by the landlord, and the painted surfaces were deteriorating throughout the rental property. Areas of chipping, peeling and flaking paint include the trim/woodwork around windows, doors and the baseboards. Also, walls, doors and kitchen cabinets. These areas of deteriorated paint were in most all rooms of the house, including the bedrooms, living room and kitchen. The front porch area woodwork was chipping, peeling and flaking as well. Plaintiff was frequently at or near these areas of deteriorated paint as an infant and toddler, and throughout his life.

Further, Sherald stated that Rochkind "did not correct the deteriorated paint conditions when asked to do so or when otherwise informed of the presence of chipping peeling and flaking paint inside the premises." *Id.* at 7-8.

In addition, Sherald provided his blood lead levels with respect to five dates. *Id.* at 9. His first test is dated March 7, 1997, and his last test is dated September 27, 2006. *Id.* The parties appear to agree for the purposes of the motions that Sherald's final blood lead levels were elevated. *See* ECF 25 at 33; ECF 29 at 7.

After some discovery, the Tort Case settled, and the parties stipulated to a dismissal of that case, with prejudice. *See Sherald v. Rochkind*, No. 24-C-17-000943, ECF 56/0, ECF 57/0 (Feb. 8, 2019; March 13, 2019).[4] The parties have not provided the Court with the terms of the settlement.

_____

[4] A "court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the

## II.    The Policy

As noted, Allstate's request for declaratory judgment arises out of a Personal Umbrella Policy of insurance issued to Rochkind. *See* ECF 1-3. The Policy covered the Property from June 13, 1988 until June 13, 2000. *Id.* at 8; ECF 1, ¶ 11.

The Policy (ECF 1-3) "applies to an **occurrence** anywhere in the world while the insurance is in force." *Id.* at 10. An "occurrence" is "an accident or continuous exposure to conditions." *Id.*

Pursuant to the Policy, "**Allstate** will defend an **insured** if sued as the result of an **occurrence** covered by this policy even if the suit is groundless, false or fraudulent." *Id.* at 14. Further, "**Allstate** will pay when an **insured** becomes legally obligated to pay for **personal injury** or **property damage** caused by an **occurrence**." *Id.* at 12.[5]   The Policy defines "personal injury," in relevant part, to include "bodily injury, sickness, disease or death of any person." *Id.* at 11.

Effective June 13, 1999, Allstate added an endorsement to the Policy. *Id.* at 17-19 (the "Endorsement"). The Endorsement contains several exclusions, including an exclusion for physical injury resulting from exposure to lead. *Id.* at 18, Exclusion 10 (the "Lead Coverage Exclusion"). The Endorsement provides, *id.* at 17-19:

**Policy Endorsement**

***The following endorsement changes your policy. Please read this document carefully and keep it with your policy.***

***This Endorsement Changes Your Policy—Keep It With Your Policy***

**Personal Umbrella Policy**

_____

trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

[5]  After the 1999 modification, the Policy said: "Allstate will pay when an insured becomes legally obligated to pay for personal injury, property damage or bodily injured caused by an occurrence." ECF 25 at 5 (internal footnotes omitted).  This change does not affect the resolution of the cross motions.

**Amendatory Endorsement—AP779**

* * *

D. The following exclusions are added:

    10. to **personal injury** or **bodily injury** which results in any manner from any type of vapors, fumes, acids, toxic chemicals, toxic gases, toxic liquids, toxic soils, waste materials, irritants, contaminants, or pollutants, including, but not limited to:

      a) lead in any form;

      b) asbestos in any form;

      c) radon in any form; or

      d) oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from a storage tank.

* * *

    11. to **property damage** consisting of, or caused by, any type of vapors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste materials, irritants, contaminants, or pollutants, including, but not limited to:

      a) lead in any form;

      b) asbestos in any form;

      c) radon in any form; or

      d) oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from a storage tank.

* * *

    12. to any liability imposed upon any **insured** by any governmental authority for **personal injury** or **bodily injury** which results in any manner from, or for **property damage** consisting of, or caused by, any type of vapors, fumes, acids, toxic chemicals, toxic gases, toxic liquids, toxic soils, waste materials, irritants, contaminants, or pollutants, including, but not limited to:

      a) lead in any form;

      b) asbestos in any form;

      c) radon in any form; or

      d) oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from a storage tank.

    13. to any loss, cost or expense arising out of any request, demand, or order that any **insured** test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to or assess the effects of any vapors, fumes, acids, toxic chemicals, toxic gases, toxic liquids, toxic soils, waste materials, irritants, contaminants, or pollutants, including, but not limited to:

      a) lead in any form;

      b) asbestos in any form;

      c) radon in any form; or

d) oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from a storage tank.

### III.    Choice of Law

Allstate asserts that Maryland law governs the legal issues in this diversity case.  ECF 22-1 at 8.  Defendants do not contest the point; they assume, without discussion, that Maryland law applies here.  *See* ECF 25.

In an action based upon diversity of citizenship, a federal court must apply the substantive law of the state in which it sits, including that state's choice of law rules.  *Klaxon Co. v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *see Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *see Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).

In a contract claim, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract.  *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *see also Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Lewis v. Waletzky*, 422 Md. 647, 657 n.8, 31 A.3d 123, 129 n.8 (2011).  "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs."  *Konover Property Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

The Policy does not appear to contain a choice of law clause.  *See* ECF 1-3.  Nor is it clear that the Policy was executed in Maryland, although the Property and the insureds are located in

Maryland.  But, "[t]ypically, '[t]he *locus contractus* of an insurance policy is the state in which the policy is delivered and the premiums are paid.'" *Porter Hayden*, 116 Md. App. at 673, 698 A.2d at 1200 (citation and some internal quotation marks omitted).  This is because delivery of the policy and the payment of the premium are ordinarily the last acts necessary to make an insurance policy binding.  *See Aetna Cas. & Sur. Co. v. Souras,* 78 Md. App. 71, 77, 552 A.2d 908, 911 (1989).

In any event, because the parties implicitly agree that Maryland law governs their claims, [the Court] need not inquire further into the choice-of-law questions." *Vanderhoof-Forschner v. McSweegan*, 215 F.3d 1323 (Table) at *2 n.2 (4th Cir. 2000) (citing *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.")).  Accordingly, I shall apply the substantive law of Maryland.

## IV.    Motion for Certification

Before proceeding to the cross motions for summary judgment, the Court must consider whether it should even reach them or, instead, certify questions to the Maryland Court of Appeals, as requested by defendants.

Under the Maryland Uniform Certification of Questions of Law Act ("Certification Act"), Md. Code (2013 Repl. Vol., 2017 Supp.), § 12–601 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."), this Court may certify to the Maryland Court of Appeals a question of law "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling [Maryland] appellate decision, constitutional provision, or statute . . . ."  Defendants maintain that two unsettled questions of State law are potentially dispositive of this case and

therefore they ask the Court to certify them to the Maryland Court of Appeals. *See* ECF 25 at 33-50.

The two issues address the proper method of allocating the damages and defense costs arising from lead-paint poisoning disputes. The first issue (the "Allocation Issue") concerns whether Allstate is liable for all of the damages and defense costs (the "all sums method") or, instead, only the portion of the damages equal to its share of the time on the risk (the "pro rata method"). The second issue (the "Exposure Issue") concerns the duration of Sherald's exposure to lead.

As to the Allocation Issue, defendants maintain that the all sums method applies. It provides that an insurer whose coverage is triggered is liable for the full amount of the judgment against the policyholder, up to the amount of its policy limit. ECF 25 at 14-33. Not surprisingly, Allstate supports the pro rata method, which limits an insurer's liability to "that period of time it was on the risk compared to the *entire* period during which damages occurred.'" ECF 22-1 at 8 (quoting *Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. 256, 313, 802 A.2d 1070, 1104 (2002), *cert. granted*, 371 Md. 613 (2002), *cert. dismissed*, 374 Md. 81 (2003)) (emphasis in original). That is, an "'insurer's liability (up to its policy limit) is measured by the underlying loss multiplied by the ratio of time covered by the policy to the time subject to the risk. The denominator of this fraction [is] the total period of risk . . . [and] the numerator . . . is . . . the portion of [the total period of risk] during which [the insured] had coverage from [the insurer].'" ECF 22-1 at 9 (quoting *Sybron Transition Corp. v. Security Ins. of Hartford*, 258 F.3d 595, 597 (7th Cir. 2001) (second alteration mine; all other alterations in Allstate's Motion); *see also Roberts*, 668 F.3d at 113; *Utica*, 145 Md. App. at 312, 802 A.2d at 1103-04.

With respect to the Exposure Issue, when using the pro rata method to calculate the insurer's share of the damages, the exposure period represents the denominator, *i.e.*, the total period of the tort plaintiff's risk. However, when employing the all sums method, the length of the tort plaintiff's exposure period does not affect the allocation of the damages. Instead, the insurer is liable for all damages up to the policy limit.

The parties dispute the end date of Sherald's exposure period. According to Allstate, the Fourth Circuit in *Roberts*, 668 F.3d at 106, concluded that the end date is the date of the tort plaintiff's final test showing an elevated blood lead level. ECF 22-1 at 10. Defendants maintain that the end date is June 13, 1999, when coverage for lead exposure under the Policy terminated. They claim Sherald's Tort Case Complaint alleged damaging exposure only through that date. ECF 25 at 33; *see* ECF 1-2 at 13, 15

### A.     Proposed Questions for Certification

Defendants propose the following two questions for certification to the Maryland Court of Appeals, which I quote in full, ECF 25 at 34:

1.  Where a carrier becomes legally obligated to pay damages and defense costs for bodily injury caused by an "occurrence" by the happening of some portion of that bodily injury during the policy period, is the triggered policy liable up to its limits for the entire amount of indemnity and defense costs, or is the policy's liability limited to a pro rata portion of the indemnity and defense costs based upon the number of years which the policy provided coverage and the years of which bodily injury took place (the "Allocation Issue"); and

2.  Where a lead paint plaintiff only alleges exposure during the policy period, is the carrier entitled to unilaterally calculate the entire period over which plaintiff has recorded elevated blood levels as the "period of exposure" for *Roberts*-type allocation [*i.e.*, pro rata allocation] (the "Exposure Issue")?[6]

---

[6] *See Roberts*, 668 F.3d 106, discussed, *infra*.

To this Court's knowledge, the Maryland Court of Appeals has not addressed either of the questions proposed for certification. But, the Maryland Court of Special Appeals has addressed the first question. *See Md. Cas. Co. v. Hanson*, 169 Md. App. 484, 902 A.2d 152 (2006); *Riley v. United Servs. Auto. Ass'n*, 161 Md. App. 573, 871 A.2d 599 (2005), *aff'd on other grounds*, 393 Md. 55, 899 A.2d 819 (2006); *Utica*, 145 Md. App. 256, 802 A.2d 1070.

### B.      Standard for Certification

The role of a federal court when considering an issue of state law is to "interpret the law as it believes that state's highest court of appeals would rule." *Abadian v. Lee*, 117 F. Supp. 2d 481, 485 (D. Md. 2000) (citing *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir.), *cert. denied*, 506 U.S. 824 (1992)); *accord Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002) (stating that federal court's task in considering an issue of state law is to "predict how [the state's highest] court would rule if presented with the issue"). Thus, a federal court ordinarily cannot speak with precedential authority on a matter of *state* law. In several procedural contexts, the Supreme Court has invoked the principles of federalism and comity, stating: "Needless decisions of state law [by federal courts] should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

The Certification Act provides that the Court may certify a question of law to the Maryland Court of Appeals "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling [Maryland] appellate decision, constitutional provision, or statute . . . ." C.J. § 12-603. The purpose of the Certification Act "is 'to promote the *widest possible use* of the certification process in order to promote judicial economy and the proper

application of [Maryland]'s law in a foreign forum.'" *Proctor v. WMATA*, 412 Md. 691, 705, 990 A.2d 1048, 1056 (2010) (emphasis in original) (quoting Certification Act, § 3 cmt.)).

The Fourth Circuit has endorsed certification of substantial, unresolved questions of state law to a state's highest court, where a certification procedure is available and resolution of the question is necessary to the case. Certification "ensur[es] the correct legal outcome, aid[s] in judicial economy, and manifest[s] proper respect for federalism." *Sartin v. Macik*, 535 F.3d 284, 291 n.6 (4th Cir. 2008).

When deciding whether certification of a question of law is appropriate, a federal court must undertake a two-part inquiry. First, the court must consider whether the answer "'may be determinative of an issue in pending litigation.'" *Antonio v. SSA Sec., Inc.*, 749 F.3d 227, 234 (4th Cir. 2014) (quoting C.J. § 12-603)). Second, it must "evaluate whether . . . [the question may be answered] based on a 'controlling appellate decision, constitutional provision, or statute of [Maryland].'" *Antonio*, 749 F.3d at 234 (second alteration in original) (quoting C.J. § 12-603).

Notably, for the purpose of C.J. § 12-603, a decision of an intermediate state appellate court is not a "controlling appellate decision." *Proctor*, 412 Md. at 704, 990 A.2d at 1055 (citing *King v. Order of United Commercial Travelers*, 333 U.S. 153, 160-61 (1948)). But, if the Court of Appeals "has not spoken on the issue, 'an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court *unless it is convinced by other persuasive data that the highest court of the state would decide otherwise*.'" *Proctor*, 412 Md. at 704, 990 A.2d at 1055 (emphasis in original) (quoting *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)); *see also Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)). "Persuasive data"

exists only if the "decision of a state's intermediate court cannot be reconciled with state statutes, or decisions of the state's highest court, or both . . . ." *Assicurazioni*, 160 F.3d at 1003.

"A federal court cannot refuse to follow an intermediate appellate court's decision simply because it believes the intermediate court's decision was wrong, bad policy, or contrary to the majority rule in other jurisdictions." *Id.* Such beliefs do not constitute "persuasive data."

## C. Question 1: The Allocation Issue

In essence, defendants seek to certify the question of whether the pro rata method or the all sums method applies when an insurer becomes obligated to pay damages and defense costs for a tort plaintiff's continuous exposure to lead.[7] Defendants argue that State law on the Allocation Issue is "unsettled and confusing, with unresolved conflicts among court decisions and statutory provisions." ECF 25 at 37. As a result, they maintain that "determining or predicting Maryland law on allocation would be exceedingly difficult." *Id.*

For example, according to defendants, the Maryland Court of Special Appeals' adoption of the pro rata method in *Utica*, 145 Md. App. 256, 802 A.2d 1070, is "inconsistent" with the Court of Appeals' reasoning in *Lloyd E. Mitchell, Inc. v. Maryland Cas. Co.*, 324 Md. 44, 57, 595 A.2d 469, 475 (1991). ECF 25 at 39. The defendants also assert that the pro rata method conflicts with the Md. Code (2017 Repl. Vol., 2018 Supp.), § 19-102(a) of the Insurance Article ("Ins."). ECF 25 at 41-42.

_____

[7] An injury is continuous when it results from repeated exposure to substantially the same general harmful conditions over a period of time. *See Injury*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining a "continual injury" as an "injury that recurs at repeated intervals."). It also notes that it is "termed (but improperly) continuous injury." *Id.* Notwithstanding Black Law Dictionary's erudition, I shall follow the Maryland courts' practice of referring to "continuous" injuries.

Allstate argues that certification is unnecessary as Maryland case law firmly supports using the pro rata method to allocate damages in continuous injury cases like this one. ECF 29 at 16-21. Allstate does not address defendants' arguments regarding *Mitchell*, 324 Md. 44, 595 A.2d 469, or Ins. § 19-102(a). I agree with Allstate.

The Maryland Court of Special Appeals has decided three cases addressing the use of pro rata allocation in continuous injury cases. First, in 2002, the court considered how to allocate liability among several insurance companies for property damage resulting from the installation and presence of asbestos-containing insulation in a building. *Utica*, *supra*, 145 Md. App. at 308-14, 802 A.2d at 1100-04. The court adopted the pro rata method, reasoning that it "conforms with the realities of long term property damage resulting from asbestos in buildings." *Id.* at 309, at 1102. The court said, *id.* at 311, 802 A.2d at 1103:

> "At the time [the insured] purchased each individual insurance policy, we doubt that [it] could have had a reasonable expectation that each single policy would indemnify [it] for liability related to property damage occurring due to events taking place years before and years after the term of each policy . . . . [T]here is no logic to support the notion that one single insurance policy among 20 or 30 years worth of policies could be expected to be held liable for the entire time period."

(quoting *Public Service Company of Colorado v. Wallis and Companies*, 986 P.2d 924, 940 (Colo. 1999)) (alterations in original).

Moreover, the court "disagree[d] with . . . the 'all sums' and 'joint and several approach' *in general*." *Id.* at 310, 802 A.2d at 1102 (emphasis added). The court's logic turned on the poor fit between the all sums method and the nature of long-term and continuous injuries. These features are not unique to property damage resulting from asbestos. Rather, they are common across different kinds of injuries, including lead poisoning. Indeed, the court concluded that, "[t]o compress *long-term damage of a continuing nature* into a single policy period, which would effectively be called for under the 'joint and several' or 'all sums' approach, is 'intuitively

-14-

suspect.'" *Id.* at 311, 802 A.2d at 1103 (emphasis added) (quoting *Olin Corp. v. Insurance Co. of North America*, 221 F.3d 307, 322-23 (2d Cir. 2000)).

In 2005, in *Riley*, *supra*, 161 Md. App. at 587-94, 871 A.2d at 608-12, the Court of Special Appeals affirmed the logic of *Utica*. There, the court considered an insurer's liability under a policy for lead-induced injuries spanning multiple policy periods. "Maryland law," the court concluded, "dictates that the judgment be allocated pro rata among the policies based on their time on the risk." *Id.* at 592, 871 A.2d at 611. The Court reasoned that the all sums method "runs counter to the pro rata by time-on-the-risk allocation method adopted in continuous injury cases in Maryland." *Id.*

The Court of Special Appeals reached the same conclusion again the following year in another lead paint case. *See Hanson*, *supra*, 169 Md. App. 484, 902 A.2d 152. Noting that in *Utica* it had "specifically rejected the all-sums approach," *id.* at 519, 902 A.2d at 167 (citing *Utica*, 145 Md. App. at 311, 802 A.2d at 1103), the court again concluded that the pro rata method, not the all sums method, applies when allocating liability among insurers in lead poisoning cases. *Hanson*, 169 Md. App. at 519, 902 A.2d at 167.

Notably, the Fourth Circuit has also concluded that Maryland law requires application of the pro rata method in lead poisoning cases. In *Roberts*, 668 F.3d 106, the Court stated: "In lead paint or continuous trigger cases such as this one, Maryland courts engage in a 'pro rata by time-on-the-risk allocation' of liability." *Id.* at 113 (citing *Hanson*, 169 Md. App. at 512, 902 A.2d at 168 (quoting *Riley* 161 Md. App. at 592, 871 A.2d at 611); *In re Wallace & Gale Co.*, 385 F.3d 820 at 835 (4th Cir. 2004) (holding that after *Utica*, "the pro-rata allocation method is correct under Maryland law")). "Applying Maryland law," the Court therefore affirmed the lower court's use of the pro rata method. *Roberts*, 668 F.3d at 111; *see also Allstate Ins. Co. v. Blue*, ADC-18-1199,

2019 WL 266281, at *4 (D. Md. Jan. 18, 2019) (applying the pro rata method in a similar lead exposure case).

However, defendants argue that *Utica* conflicts with the Maryland Court of Appeals' reasoning in *Mitchell*, 324 Md. 44, 595 A.2d 469.  *See* ECF 25 at 39-41. The *Mitchell* Court concluded that exposure to asbestos during an insurance policy's coverage period triggered coverage for asbestos-related injuries that surfaced after the policy lapsed.  As a result, the court required the insurer to defend and indemnify the policyholder "for those amounts, consistent with policy limits, that [the policyholder] may be legally obligated to pay as damages in connection with the asbestos-related claims against it."  *Id.* at 61-62, 595 A.2d at 477-78.

In this language, defendants see an endorsement of the all sums method.  ECF 25 at 40.  But, the *Mitchell* Court addressed the triggering of coverage, not the means of allocating damages.  Indeed, the court did not address the all sums and pro rata methods.  Moreover, the Fourth Circuit rejected a similar argument in *In re Wallace*, 385 F.3d at 820. In that case, the Fourth Circuit reasoned that "the triggering requirement of exposure during the policy period or an obligation to indemnify on account of legal obligation to pay" is not "inconsistent with [the time on the risk decision in] *Utica Mutual*." *Id.* at 831-32.

Defendants make much of the fact that, during the *Mitchell* Court's discussion of whether coverage was triggered, it quoted *Zurich Ins. Co. v. Raymark Industries*, 118 Ill.2d 23 (1987).  ECF 25 at 40; *see Mitchell*, 324 Md. at 57-58, 595 A.2d at 475-76.  They characterize *Zurich* as a "key 'all sums' case."  ECF 25 at 40.

To be sure, the *Mitchell* Court quoted *Zurich*.  But, as noted, it never discussed the proper methodology for allocating damages.  In essence, defendants argue that, by quoting a portion of *Zurich*, *Mitchell* endorsed *Zurich* in its entirety.  *Id.* at 41.  However, when a court cites a case for

one proposition, it is not implicitly endorsing every other proposition contained in that case. Indeed, almost immediately after quoting *Zurich*, the *Mitchell* Court quoted *Ins. Co. of No. Am. v. Forty-Eight Insulations*, 451 F. Supp. 1230 (E.D. Mich. 1978), *aff'd*, 633 F.2d 1212 (6th Cir.1980), which endorsed the pro rata method. Under defendants' logic, the *Mitchell* Court adopted the contradictory position of endorsing both the all sums method and the pro rata method. Yet, it endorsed neither one.

Defendants also argue that Ins. § 19-102(a) conflicts with the pro rata method. That provision states: "A liability insurance policy issued in the State may not require the insured to pay for liability or loss under the policy." *Id.* But, this argument was rejected by the Fourth Circuit in *In re Wallace*, 385 F.3d at 832. Moreover, exposure occurring outside an insurance policy's coverage period is not necessarily a loss. As a consequence, there is no intrinsic conflict between Ins. § 19-102(a) and the pro rata method.

In light of the unambiguous case law, I see no ground for certification as to the Allocation Issue. The defendants have not presented "'persuasive data that the highest court of the state would decide otherwise.'" *Assicurazioni*, *supra*, 160 F.3d at 1002 (quoting *West*, *supra*, 311 U.S. at 237). They do not present persuasive evidence that the decisions of the intermediate courts are irreconcilable "with state statutes, or decisions of the state's highest court, or both[.]" *Assicurazioni*, 160 F.3d at 1003.

Defendants have cited other jurisdictions that apply the all sums method, ECF 25 at 15-16, 16 n.30, as well as policy considerations in support of it. *Id.* at 22-25. *But see* SCOTT M. SEAMAN & JASON R. SCHULZE, ALLOCATION OF LOSSES IN COMPLEX INSURANCE COVERAGE CLAIMS § 4:3 (2018) ("The pro rata approach . . . appears to be the emerging trend among decisions."). Even if these arguments are valid, however, a federal court's belief that "the intermediate court's decision

was wrong, bad policy, or contrary to the majority rule in other jurisdictions" is not persuasive data. *Assicurazioni*, 160 F.3d at 1003. That is, such considerations do not justify certification, in light of three decisions on the matter issued by the Maryland Court of Special Appeals.

### D.    Question 2: The Exposure Issue

The parties dispute the proper method for determining how long Sherald was exposed to lead paint, *i.e.*, the exposure period. In particular, the parties disagree over the proper end date.[8]

Allstate contends that Sherald was exposed to lead at the Property until at least the date of Sherald's "last blood lead level," on September 27, 2006. ECF 22-1 at 10 (citing ECF 22-2 at 5, 8-9). Conversely, defendants maintain that the end date should be set at June 13, 1999, when coverage for injuries from exposure to lead terminated under the Policy, because Sherald's tort suit alleged damaging exposure only through that date. ECF 25 at 33, 44-45; *see* ECF 1-2

---

[8] The parties also appear to dispute the start date, but this issue was not fully addressed. Allstate maintains that the start of the exposure period is Sherald's date of birth, March 6, 1996. ECF 22-1 at 10. Defendants appeared to agree in their Cross Motion. *See* ECF 25. However, in their reply, they assert that the proper start date is actually November 6, 1996, when Sherald was eight-months old. ECF 38 at 3.

By raising this issue only in their reply, defendants arguably deprived Allstate of a chance to respond. Accordingly, I shall focus my analysis on the end date. *Sprint Nextel Corp. v. Simple Cell Inc.*, 248 F. Supp. 3d 663, 689 (D. Md. 2017) ("To the extent that Sprint moves for summary judgment on new issues not raised in its original motion for partial summary judgment in response to Simple Cell's cross motion for summary judgment, the court declines to consider them at this time."); *see also Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (stating that "a plaintiff may not raise new claims after discovery has begun without amending his complaint"); *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013) (holding that the district court properly refused to consider an argument raised by the plaintiff for the first time in her response to the defendant's motion for summary judgment); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (holding that the plaintiff could not raise a new claim in response to the defendant's summary judgment motion); *Lee v. Certainteed Corp.*, 123 F. Supp. 3d 780, 794 (E.D.N.C. 2015) (stating that "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion").

at 13, 15.  But, because Maryland courts have not decided how to calculate the length of the exposure period, defendants seek certification.

The Court and the parties have identified only two federal cases, based on Maryland law, addressing the calculation of the end date.  *See* SEAMAN & SCHULZE § 10:2 (explaining that nationwide, there is a "relative dearth of legal decisions on proper start and stop dates for allocation purposes, as opposed to trigger rulings").  In both cases, to determine the end date, the courts looked to the record from the underlying state court trials on the tort dispute. Their decisions were fact bound and did not turn on public policy considerations or the language of the insurance policy or state law.

In the first case, an insurer sought declaratory judgment limiting its responsibility for damages to a tort plaintiff to its pro rata share.  *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Attsgood Realty*, JFM-09-2650, 2010 WL 2998681 (D. Md. July 27, 2010), *aff'd in part, rev'd in part sub nom. Pennsylvania Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106 (4th Cir. 2012).  The district court set the start date of the exposure period at the tort plaintiff's date of birth, not the date of her first elevated blood lead level.  *Id.* at *1.  It reasoned that the "evidence in the underlying litigation, including the testimony of [the tort plaintiff's] expert, . . . established that [the tort plaintiff] was first exposed to lead paint when she was born." *Id.* at *1.

By contrast, the court set the end date of the exposure period to the date of the tort plaintiff's final elevated blood lead level, not the date when the tort plaintiff moved from the Property. The court said: "[The tort plaintiff] continued to reside at the subject premises until sometime in 1998 but I find that the August 1995 test should be the cut-off date for application of the continuous trigger rule because by that time the harm had been done."  *Id.* at *1 n. 2.

On appeal, the Fourth Circuit found substantial evidence in the record that the tort plaintiff had been exposed to lead since her birth. *Roberts*, 668 F.3d at 117. Therefore, it concluded that the proper start date was the defendant's date of birth, because it marked the start of her exposure to lead. *Id.*[9] The end date was not at issue in the appeal. *Id.* at 111.

In *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Jacob Dackman & Sons, LLC*, RDB-16-cv-2640, 2017 WL 4098749 (D. Md. Sept. 14, 2017), another judge in this District considered the proper end date of the tort plaintiff's exposure to lead. After reviewing the Fourth Circuit's opinion in *Roberts*, the court concluded that it was "not bound" by *Roberts* to use the tort plaintiff's final elevated blood lead level "as the end date of the entire period during which damages occurred." *Id.* at *3. Rather, the court concluded it "must base this determination on the evidence presented at trial in the Underlying Litigation." *Id.*

The court stated that after the tort plaintiff permanently vacated the premises, he continued to have elevated blood lead levels. *Jacob Dackman*, 2017 WL 4098749, at *4. But, the court concluded that the tort plaintiff was not exposed to "an external source of lead poisoning." *Id.* As a result, the court set as the end date the date that the tort plaintiff permanently vacated the premises, because that was "the latest date of lead exposure." *Id.*

As the *Jacob Dackman* Court recognized, a court need not set the start or end dates of the exposure period to correspond with the first or last date of a test showing an elevated blood lead level. *Id.* at *3. Rather, the court must determine the appropriate dates based on the evidence. This is a question of fact, not law, and is therefore inappropriate for certification. *See* C.J. § 12-603

---

[9] The *Roberts* Court observed that the length of exposure (55 months) is the denominator, while the period of coverage (24 months) is the numerator. And, it observed: "[T]he denominator drives the amount of Penn National's liability. Roberts [the tort plaintiff] seeks to shrink it as much as possible in order to maximize her recovery" from the insurance company. *Id.* at 116.

("The Court of Appeals of this State may answer a *question of law* certified to it by a court of the United States[.]") (emphasis added).

Of import here, the record on this issue is underdeveloped. The underlying Tort Case settled before trial, and the parties have submitted only two exhibits (ECF 22-2; ECF 38-1) that are relevant to the analysis. *See Sherald v. Rochkind*, No. 24-C-17-000943, ECF 56/0 (Feb. 8, 2019).

Accordingly, certification as to the Exposure Issue is not warranted under Maryland law.

## V.     Cross Motions for Summary Judgment

In its motion for summary judgment, Allstate seeks a declaration that (1) the Policy does not cover damages resulting from exposure to lead paint on or after June 13, 1999, when the Policy first excluded coverage for lead paint poisoning, and (2) Rochkind is responsible for all damages and defense costs resulting from any exposure after that date. *Id.* at 6. In their Cross Motion, defendants argue that Allstate is not entitled to such a declaration. *See* ECF 25. They maintain that the pro rata method does not apply here and the Lead Coverage Exclusion is invalid. *Id.* at 3-33. Further, they contest the duration of Sherald's exposure to lead. *Id.* at 43-45.

### A.     Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). The nonmoving party must demonstrate that there is a dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving

party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact. In *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238, the Court reiterated: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

When, as here, the parties have filed cross motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Simply because both

parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A ALAN WRIGHT & ARTHUR MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

### B.      Principles of Contract Construction

In the federal courts, declaratory judgments are authorized by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), which provides, with exceptions not relevant here that, in "a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ."  Because the parties' rights and obligations in this case arise under the Policy, resolution of the Motion turns on the text of the Policy, which must be interpreted in accordance with Maryland law.

Maryland law is well settled that "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts." *Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 540, 921 A.2d 245, 251 (2007); *State Farm Mut. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900 A.2d 208, 225-26 (2006); *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305, 753 A.2d 533, 537 (2000).   Accordingly, "'ordinary principles of contract interpretation apply.'" *Megonnell v. United Servs. Automobile Ass'n*, 368 Md. 633, 655, 796 A.2d 758, 772 (2002) (citation omitted); *see Dutta v. State Farm Ins. Co.,* 363 Md. 540, 556, 769 A.2d 948, 957 (2001).

In "'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.'"  *Universal Underwriters Ins.*

*Co. v. Lowe*, 135 Md. App. 122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779, 625 A.2d 1021 (1993)). However, the court bears responsibility for ascertaining the scope and limitations of an insurance policy. *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194, 199 (2001); *Mitchell*, 324 Md. at 56, 595 A.2d at 475.

The Maryland Court of Appeals has explained that judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties." *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003). Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters Ins. Co.*, 135 Md. App. at 137, 761 A.2d at 1005; *see Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's London*, 788 F.3d 375, 379 (4th Cir. 2015) (quoting *Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 166, 702 A.2d 767, 771 (1997)); *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14-15, 852 A.2d 98, 106 (2004); *Litz v. State Farm Fire and Casualty Co.*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997).

"If the policy's language is clear and unambiguous, the Court will assume the parties meant what they said." *Capital City*, 788 F.3d at 379 (quoting *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013)). "'Unless there is an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning.'" *Maryland Cas. Co. v. Blackstone Intern. Ltd.*, 442 Md. 685, 695, 114 A.3d 676, 681 (2015) (quoting *Mitchell*, 324 Md. at 56, 595 A.2d at 475). However, if there is evidence that the parties intended to ascribe a special or technical meaning to certain words used

in an insurance contract, those words are construed in accordance with that understanding. *Valliere v. Allstate Insurance Co.*, 324 Md. 139, 142, 596 A.2d 636, 638 (1991) ("When a policy defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *see also Walk*, 382 Md. at 14-15, 852 A.2d at 106; *Dutta*, 363 Md. at 556, 769 A.2d at 957.

Moreover, the insurance policy, including endorsements, "must be construed as a whole and 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution' must be examined." *Riley*, 393 Md. at 79, 899 A.2d at 833 (quoting *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779, 784 (1995)); *Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 458, 889 A.2d 387, 393 (2006); *see Prince George's Cty. v. Local Gov't Ins. Trust*, 388 Md. 162, 173, 879 A.2d 81, 88 (2005) ("In general, the main insurance policy and an endorsement constitute a single insurance contract, and an effort should be made to construe them harmoniously."); *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985); *see also Capital City*, 788 F.3d at 379.

If the court deems the provisions of an insurance policy unambiguous, the meaning of the terms is determined by the court as a matter of law. *Clendenin Bros. Inc.*, 390 Md. at 459, 889 A.2d at 393; *see Roberts*, 668 F.3d at 118 (applying Maryland law). In that circumstance, "'a court has no alternative but to enforce those terms.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutta,* 363 Md. at 557, 556 A.2d at 1138). But, if a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning. *Cole,* 359 Md. at 305, 753 A.2d at 537. A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Id.* at 306, 753 A.2d at 537.

"'[U]nlike the majority of other states, Maryland does not follow the rule that insurance policies are to be most strongly construed against the insurer.'" *Capital City*, 788 F.3d at 379 (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 97, 699 A.2d 482, 494 (1997)); *see Megonnell*, 368 Md. at 655, 796 A.2d at 771; *Bushey v. Nothern Assurance Co. of America*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992). But, "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros.*, 390 Md. at 459-60, 889 A.2d at 394; *see Callaway*, 375 Md. at 280, 825 A.2d 995, 1005-06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer."). In other words, where ambiguous language remains, the court "construe[s] that language 'liberally in favor of the insured and against the insurer *as drafter of the instrument.*'" *Connors v. Gov't Employees Ins. Co.*, 442 Md. 466, 481-83, 113 A.3d 595, 603-05 (2015) (emphasis in original) (quoting *Megonnell*, 368 Md. at 655, 796 A.2d at 772).

## C.     Discussion

Allstate seeks a declaration that caps its liability at its pro rata allocation of damages, which Allstate estimates is 30.1%. *Id.* To calculate this number, Allstate claims that it followed the method in the Fourth Circuit's decision in *Roberts*, *supra*, 668 F.3d at 113. That is, Allstate claims its liability corresponds to Allstate's time on the risk divided by the period of time between Sherald's date of birth and the date of his last elevated blood lead level. So, Allstate claims the Policy covered only the 1,195 day period from March 6, 1996 (Sherald's date of birth) to June 13, 1999 (the date of the Policy modification, excluding lead coverage). ECF 22-1 at 10. And, it asserts that the entire period during which damages occurred is the 3,858 day period between

March 6, 1996 (Sherald's date of birth) and September 27, 2006 (the date of his last blood lead level test). *Id.* Therefore, Allstate believes it is responsible for 30.1% (1,195/3,858) of damages in the underlying suit.

Defendants disagree. First, they maintain that the all sums method, not the pro rata method, applies here. As discussed, the all sums method provides that an insurer whose coverage is triggered is liable for the full amount of the judgment against the policyholder, up to the amount of its policy limit. By contrast, the pro rata method provides that an "insurer is liable for that period of time it was on the risk compared to the entire period during which damages occurred." ECF 22-1 at 8 (internal citation omitted) (emphasis omitted). Second, defendants maintain that the Lead Coverage Exclusion is invalid. Third, they claim that even if the pro rata method applies to damages, Allstate is responsible for all of Rochkind's defense costs in the underlying suit. Fourth, they claim that the final test of Sherald's blood lead level is not the appropriate end point for determining Sherald's exposure period to lead (*i.e.*, the denominator in the pro rata calculation).

### 1.     Stanovich Affidavit

Defendants rely on the Affidavit of Craig. F. Stanovich to support many of their contentions. ECF 25-1. Stanovich holds designations as a Chartered Property and Casualty Underwriter; Certified Insurance Counselor; Certified Risk Manager; and Associate in Underwriting. *Id.* He also asserts that he has been "qualified as an expert witness in both state and federal court on numerous matters relating to insurance." *Id.* Stanovich offers opinions on his view of the proper interpretation and application of the Policy and relevant case law. *Id.* at 2-8. Allstate argues: "Mr. Stanovich's Affidavit offers legal opinions that are not admissible." ECF 29 at 13.

Fed. R. Evid. 702 permits expert testimony from "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" if the "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" But, the opinion must be "based on sufficient facts or data", Rule 702(b), and it must be "the product of reliable principles and methods", Rule 702(c), that are "reliably applied" to "the facts of the case." Rule 702(d); *see, e.g.*, *United States v. Smith*, ___ F.3d ___, 2019 WL 1372326, at *6 (4th Cir. Mar. 27, 2019). "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). And, an expert's opinion may concern "questions of fact that are committed to resolution by the jury." *United States v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006).

But, testimony that states a legal conclusion is not admissible. *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 512 (D. Md. 2014); *see also United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011); *United States v. Chapman*, 209 Fed. App'x. 253, 269 (4th Cir. 2006); Fed. R. Evid. 704 advisory committee note. Additionally, "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible. *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006).

Although the Fourth Circuit has noted that "[t]he line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern," this is not one of those cases. *McIver*, 470 F.3d at 562. The interpretation of a contract is a question of law, not fact. *See Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987). To the extent Stanvoich's Affidavit addresses interpretation of the Policy and related case law, I shall not consider it.

### 2. The Pro Rata Method

### i. Reconsidering the Pro Rata Method

Defendants urge the Court to reconsider the well established case law supporting use of the pro rata method. *See* ECF 25 at 14-33. They also maintain that the Maryland Court of Special Appeals is likely to reconsider application of the pro rata method in *Robinson v. CX Re*, No. 01888, Sept. Term 2016 (Md. Ct. Spec. App.). Although *Robinson* was argued on November 9, 2017, it apparently has not yet been decided. Therefore, defendants urge the Court to delay ruling on the Allstate Motion until the Court of Special Appeals decides *Robinson*.

However, as indicated, the Court of Special Appeals and the Fourth Circuit have made clear that the pro rata method governs damage allocations in continuous injury disputes in Maryland. *See Roberts*, 668 F.3d 106; *Hanson*, *supra*, 169 Md. App. 484, 902 A.2d 152; *Riley, supra,* 161 Md. App. 573, 871 A.2d 599; *Utica*, *supra*, 145 Md. App. 256, 802 A.2d 1070. Even if the Court were persuaded by defendants' arguments, it is nevertheless bound by the Fourth Circuit's decision in *Roberts*. For the same reasons, I see no reason to wait for the Court of Special Appeals to decide *Robinson v. CX Re*. Accordingly, I shall not delay my ruling.

### ii.    The Policy

Defendants maintain that the pro rata method does not apply here because the Policy is different from the kind of insurance policy at issue in *Roberts*, 668 F.3d 106. According to defendants, *Roberts* "has no conceivable application" to this case, which involves a personal umbrella policy, because *Roberts* involved a standard CGL policy. ECF 25 at 2. Defendants maintain that the language of the CGL policy was the basis for the pro rata allocation in *Roberts*. *Id.*

In *Roberts*, the insurance policy stated that it did not cover "damages . . . for injuries that occurred outside of the policy period." *Roberts*, 668 F.3d at 112. In this case, the Policy states: "Allstate will pay when an insured becomes legally obligated to pay for personal injury or property

damage caused by an occurrence." ECF 1-3 at 12 (emphases omitted).[10]  Therefore, defendants

contend that the Policy does not restrict coverage to injuries sustained during the Policy period.

But, the Policy contains other language limiting the scope of its coverage. The Policy states

that it "applies to an **occurrence** anywhere in the world **while the insurance is in force**." ECF 1-3

at 10 (second emphasis added).  "Whether it is phrased as 'during the policy period' or 'while the

insurance is in force,'" the resulting plain meaning is the same." *Allstate Ins. Co. v. Blue*, ADC-

18-1199, 2019 WL 266281, at *3 (D. Md. Jan. 18, 2019) (citing the same language to reject the

same argument that defendants make here).  Indeed, it is difficult "to imagine any other

interpretation than what is clearly stated in the contract above." *Id.*

### iii.    The Unavailability Rule

Next, defendants allege that Rochkind could not obtain coverage for lead exposure after

the Lead Coverage Exclusion went into effect in 1999. Therefore, they rely on the "unavailability

rule," which provides that when "a policyholder . . . attempts to obtain coverage but the insurance

industry refuses to offer it," the policyholder is not accountable "for a pro rata share of costs during

periods in which insurance is not available."  ECF 25 at 13.  As a result of the so called

"unavailability rule," defendants maintain that Rochkind is not liable for a pro rata share of the

damages. *Id.* at 12-13.

The Court is not persuaded by this argument.  Defendants cite no authority for the existence

of such a rule in Maryland, nor could the Court find any Maryland cases discussing such a rule.

Moreover, "the vast majority of decisions applying a pro rata allocation methodology require that

---

[10]  As noted, after the 1999 modification, the Allstate Policy said: "Allstate will pay when an insured becomes legally obligated to pay for personal injury, property damage or bodily injured caused by an occurrence." ECF 25 at 5 (internal footnotes omitted).  This change does not affect the resolution of this issue.

the policyholder contribute for 'bare' periods regardless of whether applicable insurance was 'available' or 'unavailable.'" SEAMAN & SCHULZE § 4:3. Additionally, as Allstate notes, defendants provide no evidence that Rochkind could not obtain insurance covering lead exposure. *See* ECF 29 at 12 n.2.

As the *Roberts* Court said, 668 F.3d at 113, the Court cannot "turn a blind eye" to the Policy terms, so as to "hold an insurance company liable for risks for which it never contracted and for which it never received premiums." It added that the "regrettable reality" of a lack of coverage does not permit the Court "to hold an insurance company to a contractual provision" to which it did not agree. *Id.* at 115.

### 3. Lead Coverage Exclusion

### i. Pollution Exclusion

Defendants next claim that the Endorsement does not apply to personal injuries resulting from lead-paint inside a residence. As noted earlier, the Endorsement states, in relevant part, ECF 1-3 at 18 (emphases in Policy):

> D. The following exclusions are added:
>   10. to **personal injury** or **bodily injury** which results in any manner from any type of vapors, fumes, acids, toxic chemicals, toxic gases, toxic liquids, toxic soils, waste materials, irritants, contaminants, or pollutants, including, but not limited to:
>       a) lead in any form;
>       b) asbestos in any form;
>       c) radon in any form; or
>       d) oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from a storage tank.
>                          * * *
>   12. to any liability imposed upon any **insured** by any governmental authority for **personal injury** or **bodily injury** which results in any manner from, or for **property damage** consisting of, or caused by, any type of vapors, fumes, acids, toxic chemicals, toxic gases, toxic liquids, toxic soils, waste materials, irritants, contaminants, or pollutants, including, but not limited to:
>       a) lead in any form;

b) asbestos in any form;
c) radon in any form; or
d) oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from a storage tank.

13. to any loss, cost or expense arising out of any request, demand, or order that any **insured** test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to or assess the effects of any vapors, fumes, acids, toxic chemicals, toxic gases, toxic liquids, toxic soils, waste materials, irritants, contaminants, or pollutants, including, but not limited to:
a) lead in any form;
b) asbestos in any form;
c) radon in any form; or
d) oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from a storage tank.

Defendants maintain that the Lead Coverage Exclusion (*i.e.*, Exclusion 10), which applies to personal and bodily injury, is actually a pollution exclusion. *Id.* at 10-12. They claim that when it is read in context with Exclusion 12 and Exclusion 13, it is evident that the Lead Coverage Exclusion applies only to environmental pollution. That is, in defendants' view, the Lead Coverage Exclusion terminated coverage of personal injuries resulting from environmental exposure to lead, such as "lead paint stripped from a building that contaminates the soil." *Id.* However, defendants believe that the Policy continues to cover lead paint that remains inside the residence. *Id.* at 12.

In *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 506-07, 667 A.2d 617, 618 (1995), the Maryland Court of Appeals considered the following exclusion under the heading "Losses We Do Not Cover":

We do not cover bodily injury or property damage which results in any manner from the discharge, dispersal, release, or escape of:
a) vapors, fumes, acids, toxic chemicals, toxic liquids or toxic gasses;
b) waste materials or other irritants, contaminants or pollutants.

The insurer argued that lead paint fell within the terms "contaminants" and "pollutants." *Id.* at 508, 667 A.2d at 619. The court reasoned that these two terms "are susceptible of two interpretations by a reasonably prudent layperson." *Id.* at 509, 667 A.2d at 620. "By one interpretation, these terms encompass lead paint; by another interpretation, they apply only to cases of environmental pollution or contamination, and not to products such as lead paint." *Id.* Further, the court was concerned that terms, like "'contaminant,' when viewed in isolation, are virtually boundless, for 'there is virtually no substance or chemical in existence that would not irritate or damage some person or property.'" *Id.* at 512-13, 667 A.2d at 621 (quoting *Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992)).

In light of the ambiguity, the court construed the policy against the drafter, the insurance company. *Sullins*, 340 Md. at 513, 667 A.2d at 621-22. However, the court said: "'To be sure that lead paint poisoning claims were excluded from coverage, [the insurer] could have included a provision . . . explicitly excluding such claims.'" *Id.* at 518 n.3, 667 A.2d at 624 n.3; *see also Brownlee v. Liberty Mut. Fire Ins. Co.*, 456 Md. 579, 587, 175 A.3d 697, 702 (2017).

A judge in this district previously considered a pollution exclusion, but the policy defined "pollutants" to include "'substances which are generally recognized in industry or government to be harmful or toxic to *persons*, property or the environment[.]'" *Clipper Mill Fed., LLC v. Cincinnati Ins. Co.*, JFM-10-1647, 2010 WL 4117273, at *7 (D. Md. Oct. 20, 2010). As a result of the broader definition of "pollutants," the court recognized that the pollution exclusion was not limited to environmental pollutants. Therefore, it concluded that the exclusion applied to "'airborne contaminants.'" *Id.*

Here, the exclusion applies to "personal injury or bodily injury which results in any manner from any type of . . . contaminants or pollutants, including . . . [l]ead in any form[.]" ECF 1-3

at 18.  This provision is not "susceptible of two interpretations by a reasonably prudent layperson." *Sullins*, 340 Md. at 510, 667 A.2d at 620.  Unlike the exclusion in *Sullins*, and akin to the expansive definition of pollutants in *Clipper Mill*, the exclusion here expressly incorporates "[l]ead in any form" into the coverage exclusion.  The result is unambiguous: Lead paint poisoning is a personal injury that results from exposure to lead paint, which is a form of lead.  Defendants' contrary interpretation is simply too attenuated in light of the coverage exclusion's clear reference to lead.

### ii.    Inadequate Notice of Lead Coverage Exclusion

Defendants contend that Rochkind received inadequate notice of the Endorsement and therefore the Lead Coverage Exclusion.  ECF 25 at 8-9.  As a result, they claim that the Lead Coverage Exclusion is invalid.  *Id.*   Conversely, Allstate maintains that Rochkind received sufficient notice.  ECF 29 at 11-12.  Further, it argues that defendants are barred from contesting the sufficiency of the notice because Rochkind retained the policy for the full term and is only objecting 19 years later.  *Id.* at 9-10.

Maryland cases are clear that an insurance policy may be considered a "renewed" policy even though it contains new terms.  *See World Ins. Co. v. Perry*, 210 Md. 449, 454-55, 124 A.2d 259 (1956) (stating that "parties may renew [an insurance] policy on terms different from those contained in the original contract . . . "); *see also American Casualty Co. of Reading, Pa. v. Resolution Trust Corp.*, 845 F. Supp. 318, 323 (D. Md. 1993) (observing that "Maryland recognizes that an insurance policy may be deemed a renewal even if the terms of a predecessor policy are changed"); *accord Benner v. Nationwide Mut. Ins. Co.*, 93 F.3d 1228, 1236 (1996).  However, the insured can assume that the renewed policy has not changed unless the insurer has provided proper notice of any changes.  *Benner*, 93 F.3d at 1236; *see also J.A.M. Assocs. of Baltimore v. Western World Ins. Co.*, 95 Md. App. 695, 622 A.2d 818, 822 (1993); *Gov't Emps.*

*Ins. Co. v. Ropka*, 74 Md. App. 249, 267, 536 A.2d 1214, *cert. denied*, 312 Md. 601, 541 A.2d 964 (1988). Notification should "express the changes under a conspicuous heading on the declaration pages or by separate endorsement mailed with the premium notice." *Benner*, 93 F.3d at 1236 (internal quotation omitted).

"Upon receipt of proper notice, the insured has the duty to read the notice, and the insurer is not responsible for an insured's failure to do so." *Id.* at 1237 (citing *Twelve Knotts Ltd. Partnership v. Fireman's Fund Ins. Co.*, 87 Md. App. 88, 103, 589 A.2d 105, 113 (1991)). Further, the insured must promptly examine any changes in the insurance policy and notify the insurer if it refuses to accept them. *Benner*, 93 F.3d at 1237. "If the insured accepts the policy or retains it for an unreasonable length of time, the insurer may presume that [the insured] ratified any changes and agreed to all of the terms." *Id.*

In *Benner*, the Fourth Circuit concluded that an amendatory endorsement provided adequate notice of a new exclusion provision. The exclusion provision appeared "under the bold-faced heading entitled 'Coverage Exclusions,'" in "straightforward" and "unambiguous terms." *Id.* at 1237. The provision stated that "the policy will 'not cover' bodily injury to any insured or resident family member beyond the limits required by Maryland law." *Id.* The endorsement also highlighted the document's importance "by stating at the top, '[p]lease attach this important addition to your auto policy.'" *Id.* And, it directed the policyholder "'to read each endorsement to see how your coverage may be affected,' to save the endorsements and to contact a Nationwide agent concerning any questions." *Id.*

Here, Allstate's renewal policy includes three pages of specific changes to the Policy. ECF 1-3 at 17-19. The top of the first page is titled, in large, bold-faced letters: "Policy Endorsement." *Id.* at 17. Directly under the title, a bold-faced and italicized subheading says, "***The***

*following endorsement changes your policy. Please read this document carefully and keep it with your policy.*" *Id.* A few lines below this subheading, another subheading, also bold-faced and italicized, states: "*This Endorsement Changes Your Policy—Keep It With Your Policy*[.]" *Id.* The remainder of the document contains unambiguous amendatory language. On the second page, in a standard font and normal typeface, the text states, *id.* at 18:

> D. The following exclusions are added:
>> 10. to **personal injury** or **bodily injury** which results in any manner from any type of vapors, fumes, acids, toxic chemicals, toxic gases, toxic liquids, toxic soils, waste materials, irritants, contaminants, or pollutants, including, but not limited to:
>>> a) lead in any form;
>>> b) asbestos in any form;
>>> c) radon in any form; or
>>> d) oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from a storage tank.

This amendatory endorsement sufficed to place Rochkind on notice of the exclusion. Further, by paying the premium and retaining the Policy for 19 years, without objecting to the changes, Rochkind is presumed to have ratified the changes. *Benner*, 93 F.3d at 1237.

### iii.       Inadequate Consideration for Lead Coverage Exclusion

Defendants also argue that the Endorsement and its Lead Coverage Exclusion are invalid because Rochkind received no consideration for the exclusion of coverage. ECF 25 at 10. That is, Rochkind received no reduction in premiums even though the Policy provided less coverage than the prior policy year. *See* ECF 1-3 at 6-8. Indeed, Rochkind paid $547 for three consecutive years, starting with the Policy year beginning on June 13, 1997. *Id.*

Allstate counters that defendants cannot contest the adequacy of the consideration because Rochkind retained the Policy, without objection, for nearly two decades. ECF 29 at 9-10. It also maintains that by refraining from increasing Rochkind's premiums, it provided Rochkind with consideration. *Id.* at 10-11.

The elements of a contract "are offer, acceptance, and consideration." *B-Line Med., LLC v. Interactive Digital Solutions, Inc.*, 209 Md. App. 22, 46, 57 A.3d 1041, 1055 (2012) (citation omitted). Ordinarily, a contract is not enforceable unless it is supported by consideration. *Harford Cty. v. Town of Bel Air*, 348 Md. 363, 381, 704 A.2d 421, 430 (1998). "In Maryland, consideration may be established by showing 'a benefit to the promisor or a detriment to the promisee.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 384-85, 941 A.2d 1181, 1213 (citations and some internal quotation marks omitted), *cert. denied*, 405 Md. 63, 949 A.2d 652 (2008). The Maryland Court of Appeals has said: "A promise becomes consideration for another promise only when it constitutes a binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement." *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 148, 835 A.2d 656, 661 (2003).

Typically, a policyholder's premium "provides consideration for the benefits provided by the policy, no more and no less." *Ropka*, 74 Md. App. at 275, 536 A.2d at 1227. However, when an insurer renews an insurance policy, the "'original policy premium *generally* will not be considered the needed additional consideration for a [new] restrictive endorsement.'" *Id.* at 276, 536 A.2d at 1227 (quoting APPLEMAN, 13A INSURANCE LAW AND PRACTICE, § 7603 (2d ed. 1979)) (emphasis added) (my alteration). And, "'where there has been no reduction in premium as consideration for an exclusion clause reducing the coverage contracted for in [the] original policy, the exclusion clause may be invalid for lack of adequate consideration.'" *Ropka*, 74 Md. App. at 276, 536 A.2d at 1227 (quoting APPLEMAN § 7603). Therefore, "[i]f it can be shown . . . that the insured received less coverage than that for which he paid [for the original policy] and if there was no consideration for the reduction, the attempted policy modification should be invalid for lack of consideration." *Ropka*, 74 Md. App. at 275, 536 A.2d at 1227.

However, in some cases, an insurer may reduce coverage without reducing premiums, yet still provide adequate consideration. A "decrease in premium owing to a decrease in coverage can be completely obliterated by a rate increase that goes into effect at the same time." *Ropka*, 74 Md. App. at 275, 536 A.2d at 1226-27. But, in cases where premiums remain flat or increase, the insurer must provide evidence that consideration was actually given. For example, in *Benner*, 93 F.3d at 1239, the insureds claimed they did not receive consideration after a policy renewal included a coverage reduction yet premiums increased 4.3%. But, the insurer provided evidence, including testimony from an employee, that but for the coverage reduction, the insurer would have increased premiums by 6.7%. *Id.* As a result, the Fourth Circuit concluded that the insurer's "evidence [was] sufficient to support the jury's conclusion that merely foregoing the opportunity to seek a greater increase constitutes valid consideration." *Id.*

In contrast, in *Ropka*, 74 Md. App. at 275, 536 A.2d at 1227, the Maryland Court of Special Appeals found that the insurer provided no consideration where premiums stayed flat and the record contained nothing "specifically indicating the authorization of a rate increase or the establishment of applicable rates in general."

Here, Allstate renewed Rochkind's policy in 1999. At that time, it limited his coverage while the premiums remained unchanged. Allstate maintains that it provided consideration because it did not exercise its "ability to seek a higher rate." ECF 29 at 11. But, the record contains no evidence that Allstate relinquished a rate increase. However, unlike the insured in *Ropka*, who contested the sufficiency of the consideration within two to five years of the renewal, Rochkind retained the Policy for nearly 20 years, "an unreasonable length of time," before seeking to invalidate the Policy modification for lack of the consideration. *Benner*, 93 F.3d at 1237 (citing

*Twelve Knotts*, 87 Md. App. at 103, 589 A.2d at 114).  Moreover, Rochkind was on notice of the reduction in coverage, and certainly would have known that his premiums remained flat.

The case of *AC & R Insulation Co. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 993 F. Supp. 2d 539 (D. Md. 2014), is informative.  There, the insured sought a declaratory judgment that the insurer was obligated to provide benefits under primary and umbrella policies which were amended to include asbestos exclusions. The amendments were made about 25 years prior to the claim for benefits.  Judge Grimm ruled that the statute of limitations and the doctrine of laches barred the insured from claiming benefits under the insurance policy.[11]  He observed, *id.* at 548:

> An insurance policy puts an insurer on notice that it may need to defend claims—or defend its denial of claims—for so long as the policy remains in existence. But an insurer can have no way to predict whether, decades down the line, an insured may draw into question the very process by which the insurance policy was entered into, and there is no reasonable way to prepare to defend such an action other than retaining forever an inordinate volume of records to show the insurer's conduct at the time each policy was issued. This also would put insurers at a significant disadvantage, as it would allow plaintiffs to keep a cause of action tucked away in their pocket—and maintain documentation to support their claim—with no notice or warning to an unwitting insurer who may be forced to defend its actions years later.

Indeed, in many cases, an insurer may face insurmountable obstacles to proving that it provided consideration for a policy written two decades earlier.  The insurer would likely need to produce actuarial data or testimony from employees who worked on the policy in question. Many of the documents may have been destroyed pursuant to a corporate retention policy. And, many of the employees may have left the company, become difficult to locate, or died.  Even if an employee is available, there is a good chance he or she will have no memory of a run-of-the-mill insurance policy written twenty-years ago.

---

[11] Allstate has not asserted limitations or laches.

Accordingly, because Rochkind sat on his rights for such an "unreasonable length of time," Allstate "may presume that [he] ratified any changes and agreed to all of the terms[,]" including the potential lack of consideration. *Benner*, 93 F.3d at 1237 (citing *Twelve Knotts*, 87 Md. App. at 103, 589 A.2d at 114).

### 4. Allocation of Defense Costs

Allstate seeks judgment limiting its liability for the cost of defending Rochkind to its pro rata share. ECF 1 at 6. Defendants contend that, pursuant to the Policy, Allstate is obligated to defend Rochkind and is therefore responsible for all of the defense costs. ECF 25 at 6-7. Allstate did not respond to defendants' argument. *See* ECF 29.

In relevant part, the Policy states: "Allstate will defend an insured if sued as the result of an occurrence covered by this policy, even if the suit is groundless, false or fraudulent." ECF 1-3 at 14 (emphases omitted).

Maryland law recognizes "an insurance company's duty to defend its insured for all claims which are potentially covered under an insurance policy." *Maryland Cas. Co.*, 442 Md. at 695, 114 A.3d at 682; *see Walk*, 382 Md. at 15, 852 A.2d at 106. "'Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a potentiality that the claim could be covered by the policy.'" *Walk*, 382 Md. at 15, 852 A.2d at 106 (emphasis in original) (quoting *Brohawn v. Transamerica Insurance Co.*, 276 Md. 396, 407-08, 347 A.2d 842, 850 (1975)). Indeed, "[i]f there is any doubt as to whether there is a duty to defend, it is resolved in favor of the insured." *Id.* at 16, 852 A.2d at 106-07. Therefore, the insurer is obligated to defend an insured if "the underlying tort suit . . . allege[s] action that is potentially covered by the policy, no matter how attenuated, frivolous, or illogical

that allegation may be." *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 643, 679 A.2d 540, 544 (1996) (emphasis in original); *see Cochran*, 337 Md. at 102-03, 651 A.2d at 861.

Determining whether an insurer has a duty to defend is a two-step process. In *Capital City*, 788 F.3d at 379, the Fourth Circuit reiterated two categories of questions to resolve the issue, and said, *id.* at 379:

> "(1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses on the allegations of the tort suit. At times these two questions involve separate and distinct matters, and at other times they are intertwined, perhaps involving an identical issue."

(quoting *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 193, 438 A.2d 282, 285 (1981)); *see also Gemini Ins. Co. v. Earth Treks, Inc.*, 728 F. App'x 182, 184-85 (4th Cir. 2018); *Maryland Cas. Co.*, 442 Md. at 696, 114 A.3d at 682.

Therefore, in determining whether an insurer is obligated to defend a tort action, courts applying Maryland law first determine the coverage and defenses under the terms and requirements of the insurance contract, and in accordance with the principles of contract construction, as outlined above. *Capital City*, 788 F.3d at 379. As noted, in conducting this analysis, courts apply "ordinary contract principles to insurance contracts." *Id.*; *see Maryland Cas. Co.*, 442 Md. at 695, 114 A.3d at 681. Thus, the determination of coverage turns on "'the relevant policy provisions.'" *Capital City*, 788 F.3d at 379 (quoting *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, at 101); *see Harleysville Preferred Ins. Co. v. Rams Head Savage Mill, LLC*, 237 Md. App. 705, 721, 187 A.3d 797, 806 (2018); *Prince George's Cty.*, 388 Md. at 173, 879 A.2d at 88.

To my knowledge, Maryland courts have not directly addressed the allocation of a portion of defense costs to the insured in the context of a continuous injury dispute. *See* SEAMAN &

SCHULZE, app. A (50-state survey of allocation decisions with a focus on decisions addressing allocation methodology). Nevertheless, in other contexts, the Fourth Circuit, the Maryland Court of Special Appeals, and other judges in this District have explicitly "endorsed the method of apportionment applied in *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980)." *Nationwide Mut. Ins. Co. v. Lafarge Corp.*, No. CIV.A. H-90-2390, 1994 WL 706538, at *10 (D. Md. June 22, 1994); *see also Roberts*, 668 F.3d at 113; *Lafarge Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 935 F. Supp. 675, 688 (D. Md. 1996); *Utica*, 145 Md. App. at 313, 802 A.2d at 1104.

In *Forty-Eight Insulations, Inc.*, 633 F.2d 1212, an asbestos manufacturer faced several lawsuits for failure to warn asbestos workers and other users of its products that asbestos was a dangerous product. The litigants alleged exposure over a twenty-year period. During this period, the manufacturer had several insurers, but went uncovered for a portion of the period.

The manufacturer and its insurers disputed the allocation of the costs of defending the manufacturer from the onslaught of asbestos suits. The Sixth Circuit explained the manufacturer's position, *Forty-Eight, Inc.*, 633 F.2d at 1224:

> Forty-Eight argues that the insurer's obligation to defend is very broad-broader than its obligation to indemnify. Under the very wording of the insurance policies, the insurance companies had a duty to defend based on the allegations in the complaint, even if the allegations are ["]groundless, false, or fraudulent . . ."
> Forty-Eight argues further that the duty to defend is sufficiently broad so that it arises when one count of the complaint is within policy coverage and other counts are not. In many such cases, courts have not permitted apportionment of defense costs between the insurer and the insured. From these cases, Forty-Eight argues that so long as any insurance company had a duty to defend, it (Forty-Eight) should not be liable for any costs of defense, even if part or most of the underlying lawsuit concerned periods of time when Forty-Eight was uninsured.

The court acknowledged that insurers often bear the full cost of defending the policyholder "when there is no reasonable means of prorating the costs of defense between the covered and the

not-covered items." *Id.* (internal quotation omitted). But, the court concluded that when the costs of defending covered and non-covered risks can be easily apportioned, the insurer is responsible only for the cost of defending the covered risk. The court reasoned, *id.* at 1224-25:

> The duty to defend arises solely under contract. An insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period. Where the distinction can be readily made, the insured must pay its fair share for the defense of the non-covered risk.

Further, the court explained: "Were we to adopt [the manufacturer's] position on defense costs a manufacturer which had insurance coverage for only one year out of 20 would be entitled to a complete defense of all asbestos actions the same as a manufacturer which had coverage for 20 years out of 20." *Id.* at 1225. Therefore, it reasoned that defense costs, like damages, should be allocated on a pro rata basis.

The logic of *Forty-Eight Institutions* is compelling. On the other hand, Maryland has a strong presumption in favor of an insurer's duty to defend. *Cochran*, 337 Md. at 107, 651 A.2d at 863-64 ("[W]here a potentiality of coverage is uncertain from the allegations of a complaint, any doubt must be resolved in favor of the insured."). The Maryland Court of Appeals has characterized the duty to defend as "litigation insurance." *Brohawn*, 276 Md. at 410, 347 A.2d at 851. Furthermore, by "clear and unequivocal language," Allstate "has assumed the obligation of relieving its insured of the expense of defending an action alleging and seeking damages within the policy coverage." *Id.*; *see* ECF 1-3 at 14 ("Allstate will defend an insured if sued as the result of an occurrence covered by this policy, even if the suit is groundless, false or fraudulent.") (emphases omitted).

The parties' briefing on this issue only superficially addresses the complexity of resolving these potentially conflicting lines of cases. In light of the importance of this issue and the brevity of the parties' briefing, I decline to resolve the issue at this juncture.

### 5.     The Exposure Period

Allstate contends that, pursuant to the Fourth Circuit's holding in *Roberts*, *supra*, 668 F.3d 106, the end of the exposure period under the pro rata method is the date of the final test showing an elevated blood lead level. ECF 22-1 at 10. Therefore, citing Sherald's answers to interrogatories, Allstate argues that Sherald was exposed to lead at Rochkind's property "from his birth on March 6, 1996 until his last blood lead level on September 27, 2006." ECF 22-1 at 10 (citing ECF 22-2 at 5, 8-9).

Defendants assert that Allstate has assumed that "because Sherald had an elevated blood lead level of 10 mcg/dL in 2006, his lead exposure must have extended until that time." ECF 25 at 33. Further, they argue that Sherald's Tort Case alleged exposure only through June 13, 1999. ECF 25 at 33, 44; *see* ECF 1-2 at 13, 15.[12]

In support of these assertions, defendants make several representations about the testimony of their expert witnesses. However, the Court cannot consider an attorney's unsworn representations as valid evidentiary material under Rule 56(c). *See Rountree v. Fairfax Cty. Sch. Bd.*, 933 F.2d 219, 223 (4th Cir. 1991) ("The arguments of counsel, absent any evidence such as sworn affidavits accompanying objections to a motion for summary judgment, fail to meet the evidentiary standard necessary to create a genuine issue of material fact."); *see also* WRIGHT & MILLER § 2738 ("[A]n attorney's affidavit is admissible only to prove facts that are within the

_____

[12] As noted earlier, the Tort Case Complaint seems to have alleged exposure to lead dating from Sherald's birth until the time suit was filed in 2017. *See* ECF 1-2, ¶¶ 5-7.

attorney's personal knowledge and as to which the attorney is competent to testify; an affidavit stating what the attorney believes or intends to prove at trial will be disregarded."). Rather, "materials in the record," such as depositions, documents, and stipulations, must show that there is no dispute of material fact. *See* Fed. R. Civ. P. 56(a).

Defendants also submitted the affidavit of Paul Rogers, M.D. ECF 38-1. Dr. Rogers stated that he has "served as an expert pediatrician in approximately 75 lead paint poisoning cases" and has been "qualified as an expert in pediatrics and childhood poisoning in the Circuit Court for Baltimore City." *Id.* ¶ 4. According to Dr. Rogers, most ingestion of lead occurs when a child is between the ages of 8 months and 3 years old. *Id.* ¶ 11. In his opinion, "within a reasonable degree of medical probability," Sherald "was exposed to flaking and chipping lead paint and leaded dust at [the Property] from approximately the age of 9 months to at least his third birthday[.]" *Id.* ¶ 14. He also opined that "the blood tests that were recorded on April 26, 2000, when Malik was 4 years old, and on September 27, 2006, when Malik was 10 ½ years old, were the result of lead that was stored in his body from the exposure that occurred by his 3rd birthday." *Id.* Further, Dr. Rogers stated that, in his opinion, Sherald's "exposure to lead . . . from approximately 9 months until 3 years of age, was a substantial contributing factor to causing permanent brain damage to Malik Sherald[.]" *Id.* ¶ 16.

As noted, a court must determine the appropriate end date based on the evidence in the case before it. *Jacob Dackman*, 2017 WL 4098749, at *3. In *Roberts* and *Jacob Dackman*, the courts reviewed the records from the underlying state court *trials*. Here, the underlying Tort Case settled without a trial, and the parties have submitted only two exhibits (ECF 22-2; ECF 38-1) that are relevant to the analysis. *See Sherald v. Rochkind*, ECF 56/0. And, regardless of whether I may

consider the affidavit of Dr. Rogers, which Allstate has moved to strike (ECF 39), there is not enough evidence in the record for the Court to resolve this fact-bound inquiry. *See* ECF 40.

Accordingly, I reach no conclusion as to the length of the exposure period. And, I shall deny, as moot, Allstate's motion to strike.

## VI.    Conclusion

For the foregoing reasons, I shall deny the Allstate Motion, the defendants' Cross Motion, and Allstate's motion to strike.

The parties shall be directed to submit a proposed scheduling order, jointly if possible, concerning the remaining issues.

An Order follows.

Date: March 31, 2019                              _____/s/_____
                                                  Ellen Lipton Hollander
                                                  United States District Judge